# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

COLLEGIUM FUND, LLC, SERIES 5, a )
Nevada limited liability company, )
                                   )
           Plaintiff, )              Case No.: 2:13-cv-01550-GMN-VCF
         vs. )
                                     )                   **ORDER**
WELLS FARGO BANK, N.A.; SHAUN )
DONOVAN, SECRETARY OF THE )
UNITED STATES DEPARTMENT OF )
HOUSING AND URBAN DEVELOPMENT; )
ADELE KADANS; DOROTHY L. KEMP; )
DONALD R. KEMP; RAFAEL GIRALDO; )
LEONA MARTIN; and DOES I through X )
inclusive, )
                                     )
          Defendants. )
_____ )

Pending before the Court is the Motion for Injunction Pending Appeal (ECF No. 43) filed by Plaintiff Collegium Fund, LLC, Series 5 ("Plaintiff"). Defendant Housing and Urban Development filed a Response. (ECF No. 44.) Plaintiff has not yet filed a Reply, although the deadline by which to do so has not yet passed.

## I.     BACKGROUND

This case arises from the foreclosure sale based on a homeowners association lien recorded against real property located at 324 Wild Plum Ln., Las Vegas, Nevada 89107. (Notice of Removal Ex. A ("Compl.") ¶ 1, 9, ECF No. 1-2.) Plaintiff initially filed an action in state court alleging two causes of action: (1) Quiet Title as to All Defendants; (2) Declaratory Relief; (3) Unjust Enrichment; and (4) Injunctive Relief . (*Id.* ¶¶ 29-71.) The state court granted Plaintiff's request for a Temporary Restraining Order and set the matter for a hearing on the Motion for Preliminary Injunction to be held on August 28, 2013. (Notice of Removal

Ex. A at 16-19, ECF No. 1-2.)  However, prior to that date, on August 27, 2013, Defendant Housing and Urban Development ("HUD") removed the case to this Court. (Notice of Removal, ECF No. 1.)

After removal, the Court extended the temporary restraining order and ordered briefing on Plaintiff's Motion for Preliminary Injunction. (ECF No. 6.)  Based on the briefing, the Court denied Plaintiff's Motion. (ECF No. 14.)  Subsequently, Plaintiff filed a timely Notice of Appeal as to the Court's denial of the Motion for Preliminary Injunction. (ECF No. 19.)  More recently, Defendant noticed a foreclosure sale of the subject property to take place on December 19. (ECF No. 43.)  In response, Plaintiff filed the instant Motion for Injunction Pending Appeal to stay the foreclosure sale until after the Ninth Circuit decides the appeal. (ECF No. 43.)

## II.    <u>JURISDICTION</u>

Although a notice of appeal generally acts to deprive the district court of jurisdiction over the subject of the appeal, Rule 62(c) of the Federal Rules of Civil Procedure recognizes an exception which allows the district court to retain jurisdiction to "suspend, modify, restore, or grant an injunction during the pendency of the appeal . . .." *Mayweathers v. Newland*, 258 F.3d 930, 935 (9th Cir. 2001) (citing Fed. R. Civ. P. 62(c)); *see* Fed. R. Civ. P. 62(c) ("While an appeal is pending from an interlocutory order or final judgment that grants, dissolves, or denies an injunction, the court may suspend, modify, restore, or grant an injunction.).  Thus, under Rule 62(c), "[t]he district court retains jurisdiction during the pendency of an appeal to act to preserve the status quo." *Mayweathers*, 258 F.3d at 935 (quotation marks omitted).  However, this rule does not permit a district court to "materially alter the status of the case on appeal." *Id.*

Here, HUD has noticed a foreclosure sale that will be held on December 19, 2013. (Mot. 2:24–27, ECF No. 43.)  In response, Plaintiff now requests that the Court "stay the foreclosure during this action and pending appeal." (*Id.* at 2:27–28.)  In opposition, Defendants first assert

that the Court lacks jurisdiction to grant the relief that Plaintiff requests. Defendants are partially correct. True enough, the Court lacks jurisdiction to grant an injunction to maintain the status quo during the entire pendency of this action. Plaintiff previously requested this relief and the Court denied that motion. Thus, Plaintiff's appeal of the Court's denial of Plaintiff's Motion for Preliminary Injunction deprives the Court of jurisdiction to reconsider that order. However, under Rule 62(c), the Court retains jurisdiction to maintain the status quo during the pendency of an appeal. Enjoining the December 19, 2013 foreclosure sale would certainly maintain the status quo until the Ninth Circuit determines whether this Court erred in denying Plaintiff's motion for preliminary injunction.

## III.   RULE 62(C) INJUNCTION

Granting the requested injunction is "an exercise of judicial discretion that is dependent upon the circumstances of the particular case." *Lair v. Bullock*, 697 F.3d 1200, 1203 (9th Cir. 2012) (internal quotation marks omitted). A court may issue an injunction or stay if the party requesting the relief establishes each of four prongs:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Id.* (quoting *Nken v. Holder*, 556 U.S. 418, 433-34 (2009)).

### A.   Strong Showing that Success is Likely on the Merits

The Ninth Circuit has held that the party seeking relief is not required "to show that it is more likely than not that they will win on the merits." *Lair*, 697 F.3d at 1204. Rather, the petitioner need only show "that there is a substantial case for relief on the merits." *Id.* The Ninth Circuit has further recognized that one interchangeable formulation of this standard is whether there are "serious legal questions raised." *Id.* "Serious questions are substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more

Page 3 of 6

deliberative investigation." *Republic of the Phil. v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988).

In this case, given the developing split on the interpretation of section 116.3116, the Court concludes that Plaintiff has carried this burden. *Compare SFR Investments Pool 1, LLC v. Wells Fargo Bank, N.A.*, No. 2:13-cv-01153-APG-PAL (D. Nev. July 25, 2013) (concluding that the HOA had established a likelihood of succeeding on the merits of its claim that foreclosure of the super priority portion of the HOA lien extinguished a first recorded Deed of Trust) (attached as Exhibit 1), *and First 100, LLC v. Burns*, No. A677693 (8th Judicial D. Ct. Clark Cnty., Nev. May 30, 2013) (concluding that, pursuant to Chapter 116 of the Nevada Revised Statutes, the non-judicial foreclosure of an HOA lien extinguishes prior recorded security interests) (attached as Exhibit 2), *with Bayview Loan Servicing, LLC v. Alessi & Koenig, LLC*, No. 2:13-cv-00164-RCJ-NJK, 2013 WL 2460452 (D. Nev. June 6, 2013) (granting summary judgment in favor of lender's assignee and holding that the foreclosure of an HOA lien did not extinguish the first mortgage) (attached as Exhibit 3). *See also CitiMortgage, Inc. v. Country Gardens Owners' Ass'n*, 2:13-cv-02039-GMN-VCF, 2013 WL 6409951, at *3 (D. Nev. Dec. 5, 2013). Accordingly, this factor favors granting the requested relief because Plaintiff established a substantial case for relief on the merits by showing the existence of serious legal questions.

### B.    Irreparable Injury to the Plaintiff

The second prong of the Rule 62(c) analysis requires the petitioner "to show . . . that there is a *probability* of irreparable injury." *Lair*, 697 F.3d at 1214; *see also Leiva-Perez v. Holder*, 640 F.3d 962, 968 (9th Cir. 2011) (recognizing that a petitioner's "burden with regard to irreparable harm is higher that it is on the likelihood of success prong, as [it] must show that an irreparable injury is the more probable or likely outcome").

Here, Plaintiff asserts that this prong is satisfied by virtue of the fact that this case

involves real property.  "It is well-established that the loss of an interest in real property constitutes an irreparable injury." *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1159 (9th Cir. 2011).  However, in *Park Village*, the irreparable harm resulted from the probable eviction of the residents absent the requested injunction. *Id.* ("[T]he individual Plaintiffs were likely to suffer irreparable harm absent preliminary relief because they faced eviction from their rental units.").  Plaintiff has not provided the Court with similarly compelling facts.  Plaintiff's motion lacks any allegation that a current resident of the subject property will be evicted if the Court were to deny the requested injunction and allow the foreclosure sale to proceed. (*See generally* Mot. 4:18–5:12, ECF No. 43.)

Furthermore, Plaintiff has failed to persuade the Court that its potential injuries could not be compensable through money damages. *See Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 12-16868, 2013 WL 6224288, at *8 (9th Cir. Dec. 2, 2013) (finding an abuse of discretion where the district court's finding of irreparable injury was "grounded in platitudes rather than evidence, and relate[d] neither to whether irreparable injury [wa]s *likely* in the absence of an injunction nor to whether legal remedies, such as money damages, [we]re inadequate" (internal quotation marks and citation omitted)).  Plaintiff merely asserts that it will be "denied the ability to protect is [sic] property rights" and that "after HUD's foreclosure sale there may be another person and/or entity claiming title to the property." (Mot. 5:5–8, ECF No. 43.)  Plaintiff also acknowledges that it could incur additional litigation costs as a result of the foreclosure sale. (*Id.* at 5:7–9.)  Each of these potential sources of harm is compensable with legal remedies and Plaintiff's motion lacks any evidence to prove otherwise.

Additionally, Plaintiff previously recorded a *lis pendens* pursuant to section 14.010 of the Nevada Revised Statutes.  Section 14.010(3) expressly provides that "[f]rom the time of recording . . . the pendency of the action is constructive notice to a purchaser or encumbrancer of the property affected thereby."  By virtue of the *lis pendens*, any purchaser at the foreclosure

sale will be deemed to have notice of this pending litigation.

Finally, Plaintiff argues that the Court should issue the requested injunction because "Plaintiff will suffer substantial harm if the sale is allowed to proceed . . .." (*Id.* at 5:11–12.) However, "substantial harm" is not necessarily irreparable harm. The Court finds that Plaintiff has failed to carry its burden of establishing that irreparable harm is probable.

### C.    Substantial Injury to Other Parties Interested in the Proceeding & Public Interest

Having determined that Plaintiff failed to establish the second prong, the Court need not address the remaining two prongs of the Rule 62(c) analysis.

## IV.    CONCLUSION

**IT IS HEREBY ORDERED** that the Motion for Injunction Pending Appeal filed by Plaintiff Collegium Fund, LLC is **DENIED**.

**DATED** this 17th day of December, 2013.

_____
Gloria M. Navarro
United States District Judge

# Exhibit 1

1

2          **UNITED STATES DISTRICT COURT**

3              **DISTRICT OF NEVADA**

4

5   SFR INVESTMENTS POOL 1, LLC, a          Case No. 2:13-cv-01153-APG-PAL
    Nevada limited liability company,

6              Plaintiff,

7      vs.                                   **ORDER GRANTING PRELIMINARY**
                                             **INJUNCTION**
8   WELLS FARGO BANK, N.A., a national
    association; JOSEPH A. HOLMES, an
9   individual; SONJA J. PALMER, an
    individual; and DOES I through X; and ROE
10  CORPORATIONS I through X, inclusive,

11             Defendants.

12

13

14         Plaintiff's motion for preliminary injunction was heard on July 23, 2013 at 2:00 p.m.

15  Diana S. Cline, Esq. and Jacqueline A. Gilbert of Howard Kim  & Associates appeared on

16  behalf of Plaintiff SFR Investments Pool 1, LLC ("SFR").  Chelsea A. Crowton, Esq. of Wright

17  Finlay & Zak LLP appeared on behalf of Defendant Wells Fargo Bank, N.A. ("Wells Fargo").

18  The court has considered the motion, the pleadings and papers on file herein, and the arguments

    of counsel.

19
           The court hereby finds that SFR has met its burden for injunctive relief.  Plaintiff has a
20
    substantial likelihood of success on the merits and will suffer irreparable harm if Wells Fargo
21
    continues with the non-judicial foreclosure proceedings before the conclusion of this litigation.
22
           Before Wells Fargo filed its notice of removal, Plaintiff filed an application for
23
    temporary restraining order and motion for preliminary injunction, seeking to enjoin Defendant
24
    Wells Fargo, its successors, assigns and agents from continuing foreclosure proceedings, selling,
25
    transferring, or otherwise conveying the real property commonly known as **2650 Upland Bluff**
26
    **Drive, Las Vegas, NV 89142 Parcel No. 161-11-112-032** (the "Property").  On July 10, 2013,
27

28

                                              - 1 -

1    this Court issued a temporary restraining order enjoining the trustee's sale scheduled for Friday,

2    July 12, 2013 and required Plaintiff to post a $5,000 bond.

3        Plaintiff acquired title to the Property through a quit claim deed dated March 6, 2013

4    from Sunrise Highlands Community Association (the "Association"). According to a

5    foreclosure deed recorded on February 14, 2013, the Association acquired title to the Property

6    on June 27, 2012 at a publicly-held foreclosure auction pursuant to the powers conferred by the

7    Nevada Revised Statutes 116 *et seq.* and a Notice of Delinquent Assessment (Lien), recorded on

8    November 24, 2010.

9        Defendants Joseph A. Holmes and Sonja J. Palmer obtained title to the Property in

10    August of 2007 through a Grant, Bargain, Sale Deed. On August 10, 2007, Wells Fargo

11    recorded a deed of trust against the Property to secure a loan to Holmes and Palmer ("Deed of

12    Trust"). A Notice of Default and Election to Sell pursuant to the terms of Deed of Trust was

13    recorded on December 10, 2012. A Notice of Sale pursuant to the terms of the Deed of Trust

14    was recorded on June 11, 2013.

15        Plaintiff argues that Wells Fargo's foreclosure of its Deed of Trust is improper because

16    the July 27, 2013 foreclosure of the Association's lien containing super priority amounts

17    extinguished the Deed of Trust. Wells Fargo argues that NRS 116.3116(2) establishes a

18    "payment priority" that requires payment to the Association if a first security interest forecloses,

19    but does not give the Association the ability to extinguish a first security interest through

20    foreclosure of an Association's lien.

21        The court finds that NRS 116.3116 is clear, not ambiguous; therefore, the court need not

22    look to the legislative history to interpret the statute.[1] Under NRS 116.3116(1), the Association

23    has a lien on the Property for amounts including delinquent assessments. Pursuant to NRS

24    116.3116(4), the recording of the Association's declaration of covenants, conditions and

25

26    [1] Even if the court were to consider legislative history and other sources, the result would be the

27    same. The court has considered the May 30, 2013 order issued by the Honorable Judge Jerome Tao in *First 100, LLC v. Burns, et al*, (Eighth Judicial District Court Case No. A-13-677693-C),

28    which contains a detailed analysis of NRS 116.3116. The Court finds Judge Tao's analysis in that order persuasive.

1   restrictions on August 1, 2006 constituted perfection and record notice of the Association's lien.

2   NRS 116.3116(2) provides that the entire Association Lien

3        is prior to all other liens and encumbrances of unit except:

4          (a) Liens and encumbrances recorded before the recordation of the declaration
and, in a cooperative, liens and encumbrances which the association creates,
5          assumes or takes subject to;
(b) A first security interest on the unit recorded before the date on which the
6          assessment sought to be enforced became delinquent or, in a cooperative, the first
security interest encumbering only the unit's owner's interest and perfected before
7          the date on which the assessment sought to be enforced became delinquent; and
(c) Liens for real estate taxes and other governmental assessments or charges
8          against the unit or cooperative.

9        NRS 116.3116(2) further provides that a portion of the Association Lien has priority over

10   a first security interest in the Property:

11          [the Association Lien] is also prior to all security interests described in paragraph
(b) to the extent of any charges incurred by the association on a unit pursuant to
12          NRS 116.310312 and to the extent of the assessments for common expenses
based on the periodic budget adopted by the association pursuant to NRS
13          116.3115 which would have become due in the absence of acceleration during the
9 months immediately preceding institution of an action to enforce the lien[.]
14

       The Association may foreclose on its lien, including the portion of its lien that has
15

priority over a first security interest, through the procedures outlined in NRS 116.31162 through
16

NRS 116.31168.
17

       In this case, the Deed of Trust held by Wells Fargo is inferior to any super priority
18

portion of the Association's lien. Therefore, the proper foreclosure of the Association's lien
19

containing super priority amounts would have extinguished the Deed of Trust. Accordingly,
20

Plaintiff has demonstrated a likelihood of success on the merits.
21

       It is up to the Nevada Legislature, not this court, to decide whether the statutory scheme
22

that allows a homeowners association lien to have priority over a first security interest is sound
23

public policy. This court's obligation is to enforce the law as written, absent some statutory or
24

constitutional infirmity.
25

       IT IS HEREBY ORDERED that Defendant Wells Fargo Bank, N.A. and its agents are
26

restrained and enjoined from continuing with foreclosure proceedings regarding (and from
27

selling, transferring, or otherwise conveying) the real property commonly known as **2650**
28

1  **Upland Bluff Drive, Las Vegas, NV 89142 Parcel No. 161-11-112-032** (the "Property") until

2  the conclusion of this litigation or further order of this court.

3       IT IS FURTHER ORDERED that the $5,000.00 bond posted by Plaintiff on July 11,

4  2013 as security for the temporary restraining order issued by this court on July 10, 2013 shall

5  remain in place as security for this preliminary injunction.  Plaintiff also shall post an additional

6  security bond in the amount of $500.00 per month for each month that this injunction remains in

7  place.  The parties may stipulate to have the bond amounts deposited into an interest-bearing

8  escrow or similar account, rather than into the court.

9       IT IS FURTHER ORDERED that Plaintiff shall maintain the Property including, but not

10  limited to, paying all homeowners association assessments and taxes, and carrying hazard

11  insurance in an appropriate amount.  Plaintiff shall disclose to Wells Fargo the amount and

12  coverage of that insurance.  If, during the litigation, Wells Fargo believes the Property is not

13  being properly maintained or protected, or that an additional bond amount is needed, it may seek

14  appropriate relief from this court.

15       Dated this 25th day of July, 2013 at 8:15 a.m.

16

17                                   UNITED STATES DISTRICT JUDGE

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 2

Electronically Filed
05/31/2013 08:50:14 AM

CLERK OF THE COURT

ORDD

DISTRICT COURT

CLARK COUNTY, NEVADA

FIRST 100, LLC,

               Plaintiff,

v.

RONALD BURNS, et al.,

               Defendants.

CASE NO.: A677693
DEPARTMENT NO. XX

**ORDER DENYING
DEFENDANT'S MOTION
TO DISMISS**

This matter having come on for hearing on the 8th day of May, 2013; Luis A. Ayon, Esq., and Margaret E. Schmidt, Esq., appearing for and on behalf of Plaintiff; Chelsea A. Crowton, Esq., appearing for and on behalf of Defendant, U.S. Bank; Karl L. Nielson, Esq., appearing for and on behalf of Defendant, Ronald Burns; Gregory L. Wilde, Esq., appearing for and on behalf of Defendant, National Default Servicing Corporation; and the Court having hearing arguments of counsel, and being fully advised in the premises, finds:

(1)    This matter comes before the Court on a Motion by Defendant U.S. Bank NA to dismiss the Complaint pursuant to Rule 12(b)(5) of the Nevada Rules of Civil Procedure ("NRCP").

(2)    This dispute arises from foreclosure proceedings conducted against a residential property located at 3055 Key Largo Drive, Unit #101, Las Vegas, Nevada 89120, identified by APN 162-25-614-153 ("the Subject Property"). The Subject

1  Property is located within a common-interest community governed by a homeowners'
2  association as defined in NRS Chapter 116, known as the Canyon Willows Owners
3  Association (HOA).  The prior owners of the property (who are not parties to this
4  action) failed to pay all monthly assessments due under the operating documents of the
5  common-interest community.  In response, the HOA asserted a lien against the Subject
6  Property and initiated foreclosure proceedings pursuant to NRS 116.3116 et seq. which
7  culminated in a foreclosure sale conducted on February 2, 2013.

8      (3)    The Plaintiff is First 100 LLC, a Nevada limited-liability corporation,
9  which alleges that it acquired the Subject Property at the February 2, 2013 public
10  auction.  According to the allegations of the Complaint, the Plaintiff properly recorded
11  a Deed on February 4, 2013 reflecting its purchase of the Subject Property.  However,
12  two days later, on February 6, 2013, the Subject Property was re-sold by way of
13  foreclosure and Trustee's Sale initiated by Defendant National Default Servicing
14  Corporation, who asserted that it was the named trustee under Deed of Trust previously
15  recorded against the Subject Property on October 30, 2006, as Instrument No.
16  200610300002548 (and referred to in the pleadings as the "BNC Mortgage Deed of
17  Trust").  Defendant Robert Burns purchased the Subject Property at the February 6,
18  2013 Trustee's Sale.

19      (4)    The Plaintiff's Complaint asserts three causes of action: (First) Wrongful
20  Foreclosure against Defendant National Default Servicing Corporation; (Second)
21  Declaratory Relief/Quiet Title against all Defendants; and (Third) Injunctive Relief
22  against Defendant Burns.

23      (5)    As framed by the parties' briefing and oral arguments, the issue before the
24  Court is a straightforward question of law.  The Plaintiff contends that the February 2
25  foreclosure sale conducted pursuant to NRS 116.3116 et seq. and based upon a lien
26  asserted by a homeowner's association for unpaid assessments automatically
27  extinguished, by operation of law, any and all prior encumbrances upon the Subject
28  Property.  Thus, according to the Plaintiff, the subsequent Trustee's Sale conducted on

2

February 6 was unlawful because the October 30, 2006 Deed of Trust against the
Subject Property had been extinguished in its entirety by the February 2 foreclosure
sale. Therefore, the Plaintiff alleges that it is the rightful and legal owner of the Subject
Property via its purchase of the Subject Property on February 2 free and clear of all
prior encumbrances.

(6)     In considering a Motion to Dismiss pursuant to NRCP 12(b)(5), the Court
must accept all factual allegations of the pleadings to be true and view those allegations
both liberally and in the light most favorable to the non-moving party. However, the
Court need not accept the parties' assertions of law as true. The Court's analysis is
limited to the factual allegations contained within the four corners of the Complaint and
all inferences reasonably arising therefrom. A claim can only be dismissed if it is clear
beyond any reasonable doubt that the plaintiff cannot prove any set of facts at trial that
would entitle it to relief. Furthermore, a complaint can be dismissed even if all of the
elements of a cause of action have been technically pled so long as the Court, relying
on "judicial experience and common sense," finds that the allegations of the complaint
are "conclusory" or "implausible." *Ashcroft v. Iqbal,* 129 S.Ct. 1937 (2009)[1].

(7)     In this case, the parties do not appear to dispute that the February 2, 2013
foreclosure sale was properly conducted in accordance with all of the legal
requirements of NRS Chapter 116. The parties also do not appear to dispute that the
BNC Mortgage Deed of Trust was a perfected legal encumbrance upon the Subject
Property properly recorded on October 30, 2006. The parties also do not appear to
dispute that the lien asserted against the Subject Property by the HOA was proper and
legal under the provisions of NRS Chapter 116. The parties also do not appear to
dispute that, if the Plaintiff's interpretation of the legal consequences of NRS Chapter
116 is correct, the Plaintiff has properly pled the elements supporting its causes of

---

[1] *Ashcroft* was decided pursuant to FRCP 12(b)(6). However, where the Nevada Rules of Civil Procedure parallel
the Federal Rules of Civil Procedure, rulings of federal courts interpreting and applying the federal rules are
persuasive authority for this Court in applying the Nevada Rules. *E.g., Executive Management Ltd. v. Ticor Title
Ins.,* 118 Nev. 46, 53 (2002). NRCP 12(b)(5) is identical to FRCP 12(b)(6).

1  action.

2      (8)     Therefore, the question before the Court is a straightforward question of

3  statutory interpretation: whether a foreclosure sale properly initiated and conducted

4  pursuant to NRS Chapter 116 automatically extinguishes all prior encumbrances on the

5  property such that a bona fide purchaser at the foreclosure sale acquires the property

6  free and clear of all prior encumbrances.

7      (9)     In interpreting the scope and meaning of a statute, the Court looks first to

8  the words of the statute. The words of a statute are assigned their ordinary meaning

9  unless it is clear from the face of the statute that the Legislature intended otherwise.

10 When "the language of a statute is plain and unmistakable, there is no room for

11 construction, and the courts are not permitted to search for its meaning beyond the

12 statute itself." *Estate of Smith v. Mahoney's Silver Nugget*, 127 Nev. Adv. Op. 76

13 (November 23, 2011). If the Legislature has independently defined any word or phrase

14 contained within a statute, the Court must apply the definition created by the

15 Legislature. If, and only if, the Court determines that the words of the statute are

16 ambiguous when given their ordinary and plain meaning, then reference may be made

17 to other sources such as the legislative history of the statute in order to clarify the

18 ambiguity. An "ambiguity" exists where a provision is susceptible to two reasonable

19 interpretations.

20     (10)    A threshold question in this case is whether the security interest

21 represented by the BNC Mortgage Deed of Trust is senior or junior to the lien asserted

22 by the HOA. NRS 116.3116 states in part as follows:

23          2.     A lien under this section is prior to all other liens and
24     encumbrances on a unit except...
           (b)     A first security interest on the unit recorded before the date on
25     which the assessment sought to be enforced became delinquent or, in a
       cooperative, the first security interest encumbering only the unit's
26     owner's interest and perfected before the date on which the assessment
27     sought to be enforced became delinquent....

28

⤝ The lien is also prior to all security interests described in paragraph (b) to the extent of...the assessments for common expenses based on the periodic budget adopted by the association pursuant to NRS 116.3115 which would have become due in the absence of acceleration during the 9 months immediately preceding institution of an action to enforce the lien, unless federal regulations adopted by the Federal Home Loan Mortgage Corporation or the Federal National Mortgage Association require a shorter period of priority for the lien. If federal regulations adopted by the Federal Home Loan Mortgage Corporation or the Federal National Mortgage Association require a shorter period of priority for the lien, the period during which the lien is prior to all security interests described in paragraph (b) must be determined in accordance with those federal regulations, except that notwithstanding the provisions of the federal regulations, the period of priority for the lien must not be less than the 6 months immediately preceding institution of an action to enforce the lien. This subsection does not affect the priority of mechanics' or materialmen's liens, or the priority of liens for other assessments made by the association.

(11)   Thus, under NRS 116.3116, a previously perfected first security interest retains its seniority over a subsequent lien asserted by a homeowners' association *except* to the extent that the subsequent association lien is based upon unpaid regular periodic assessments for common expenses. In that event, notwithstanding that the association's lien was asserted subsequently in time, a portion of the homeowners' association lien (limited to what was unpaid during the nine months immediately preceding the lien) is given artificial priority over a previously perfected first security interest. The portion of the association lien equating to what was unpaid during those nine months is commonly said to have "super-priority" status over other prior encumbrances. If the association claims that more than nine months' assessments stand unpaid, then the amount unpaid during the nine months immediately preceding the lien is entitled to "super priority" status over other encumbrances, but any assessments remaining unpaid for more than nine months would be subordinate to other previously perfected encumbrances.

(12)   The parties do not appear to dispute that the lien asserted by the HOA in this case was based upon regular periodic assessments that were unpaid during the nine

months immediately preceding the imposition of the lien. Therefore, as a matter of law, the lien asserted by the HOA is deemed to be senior to the security interest created by the BNC Mortgage Deed of Trust even though the HOA lien was asserted subsequently in time. The parties do not appear to dispute this legal conclusion.

(13)   Thus, the parties appear to agree that the HOA lien was senior to the BNC Mortgage Deed of Trust at the instant in time immediately before the property was sold via foreclosure sale to the Plaintiff on February 2, 2013. However, what the parties vigorously dispute is whether the junior security interest (the BNC Mortgage Deed of Trust) was extinguished by operation of law as a result of the February 2 foreclosure sale.

(14)   NRS 116.31162 states that, after a lien is asserted by a homeowner's association and certain procedures are followed, the association "may foreclose its lien by sale." If the association chooses to proceed with a non-judicial foreclosure sale, then NRS 116.31164 governs how the foreclosure sale is to occur. After the foreclosure sale is completed, NRS 116.31164 governs how the proceeds of the sale must be allocated. In particular, NRS 116.31164(3) states:

> 3.   After the sale, the person conducting the sale shall....
> (c)   Apply the proceeds of the sale for the following purposes in the following order:
> (1)   The reasonable expenses of sale;
> (2)   The reasonable expenses of securing possession before sale, holding, maintaining, and preparing the unit for sale, including payment of taxes and other governmental charges, premiums on hazard and liability insurance, and, to the extent provided for by the declaration, reasonable attorney's fees and other legal expenses incurred by the association;
> (3)   Satisfaction of the association's lien;
> (4)   Satisfaction in the order of priority of any subordinate claim of record; and
> (5)   Remittance of any excess to the unit's owner.

(15)   Thus, the plain language of NRS 116.31164 expressly contemplates that the proceeds must first used to pay the expenses of the sale, taxes and other governmental charges, legal expenses, and the association's lien, and then to satisfy

"subordinate claim[s] of record."

(16)   In this case, the parties agree that the proceeds of the sale totaled only approximately $2,000.00, far less than what would have been required to pay off all of the liens and security interests that existed against the Subject Property prior to the foreclosure sale. Accordingly, the question before the Court can be phrased as follows: when the proceeds from a foreclosure sale conducted pursuant to NRS 116.31164 are inadequate to satisfy all of the various lienholders when distributed as required in NRS 116.31164(3), does the failure to satisfy the subordinate interests mean that those subordinate interests survive the foreclosure sale to the extent that they remain unsatisfied, or instead that those subordinate interests are extinguished by operation of law such that a bona fide third-party purchaser at the foreclosure sale takes the property free and clear of any unsatisfied subordinate encumbrances?

(17)   The Plaintiff avers that the latter case is true. Consequently, the Plaintiff asserts that because all subordinate interests were extinguished on February 2 when it acquired the Subject Property, the subsequent foreclosure sale conducted on February 6 based upon an unpaid subordinate security interest was unlawful. On the other hand, the Defendant avers that the former must be true. Consequently, the Defendant avers that its subordinate security interest survived the February 2 sale because the interest remained unsatisfied from the proceeds of that sale, and accordingly it possessed the legal right to foreclose upon the Subject Property and trigger a second foreclosure sale in order to satisfy its subordinate interests. In effect, the Defendant argues that the Plaintiff, by purchasing the Subject Property for an amount insufficient to pay off all existing encumbrances, only acquired the property "subject to" those unsatisfied encumbrances.

(18)   The Court has reviewed the entirety of NRS Chapter 116, and there appears to be no statutory provision that expressly states that an unsatisfied junior lien either is, or is not, extinguished by operation of law as a consequence of a foreclosure sale conducted pursuant to NRS 116.31164. In their briefs, the parties are also unable

1  to identify any particular provision expressly on point. Therefore, in analyzing the
2  answer to this question, the Court must consider other sources, such as the legislative
3  history of NRS 116.31164, and other similar statutes contained within the NRS.

4      (19)   NRS Chapter 116 was originally introduced in 1991 as Assembly Bill
5  221, with the stated purpose of "adopt[ing] the Uniform Common-Interest Ownership
6  Act," or UCIOA  (Preamble of AB 221, introduced January 24, 1991; statement of
7  introduction of AB 221, Minutes of the Assembly Committee on Judiciary, February
8  20, 1991). At the time, the UCIOA had already been adopted in several other states
9  and was under consideration in at least 3 others. (Memorandum dated March 13, 1991
10 from Uniform Common Interest Ownership Act Subcommittee, in the legislative record
11 as an exhibit to Minutes of the Assembly Committee on Judiciary, March 20, 1991).
12 NRS 116.3116 originally corresponded to Section 100 of AB 221, and NRS 116.31164
13 originally corresponded to Section 102 of AB 221. The "super priority" lien verbiage
14 included within Section 100 of AB 221 is identical to NRS 116.3116 as it exists today,
15 except that the original "super priority" lien was limited to assessments unpaid during
16 the six months (rather than 9 months) immediately preceding the lien. The time period
17 was expanded to nine months in 2009 by Assembly Bill 204.

18     (20)   NRS 116.3116 was subjected to various technical amendments in 1993
19 through AB 612 (which did not affect the "super priority" language at issue here).
20 During testimony in support of the technical amendments, one of the drafters of the
21 original bill testified that:

22     "As a general proposition, it makes good sense to follow a uniform law as
23     closely as possible, utilizing the optional suggestions in the uniform act to
        customize the law as necessary. The corresponding benefit -- especially
24     important in a small state like Nevada -- is our own version of a uniform law
        with precedent in other uniform law jurisdictions. Maintaining the uniform law
25     also makes available the very helpful explanatory comments, some of which
        contain illustrative examples, and all of which, like the act itself, represent not
26     only very careful draftsmanship, but the input of all of the different groups
        involved in the homeowner association process; that is, developers, consumers,
27     lenders, local governmental authorities, state regulators, managers and other
28

professionals, as well as homeowners associations themselves." (Testimony of Michael Buckley, Chairman of the Uniform Common-Interest Ownership Act Subcommittee, before the Assembly Judiciary Committee on May 20, 1993).

(21)   Thus, one of the principal drafters of the bill expressly urged that the Nevada Legislature adhere as closely as practicable to the uniform version of the UCIOA, and the Nevada Legislature did so by enacting the "super priority" language originally included in the UCIOA into NRS 116.3116 without any amendment (and with virtually no debate). Consequently, the legislative history surrounding AB 221 contains virtually nothing useful to the Court's analysis in the case at hand. However, the Legislature apparently contemplated that adoption of the uniform language without amendment would enable Nevada courts to look to "precedent in other uniform law jurisdictions" as well as the background and explanatory comments accompanying the UCIOA in resolving questions relating to the scope and meaning of NRS 116.3116.

(22)   Indeed, the Nevada Supreme Court regularly looks outside the confines of NRS Chapter 116 and to the Uniform Act (as well as other sources) in interpreting various provisions of NRS Chapter 116. *E.g., Holcomb Condominium HOA v. Stewart Venture LLC,* 129 Nev. Adv. Op. 18 (April 4, 2013) ("the term 'separate instrument' is not defined in NRS Chapter 116 or the Uniform Common-Interest Ownership Act (UCIOA)"); *Beazer Homes Holding Corp. v. District Court,* 128 Nev. Adv. Op. 66 (Dec. 27, 2012) (citing "the commentary to the Restatement (Third) of Property, section 6.11, which mirrors section 3–102 of the Uniform Common Interest Ownership Act, upon which NRS 116.3102 is based"); *Boulder Oaks Community Association v. B&J Andrews,* 169 P.3d 1155 (2007) (unpublished) ("NRS Chapter 116 is Nevada's version of the Uniform Common-Interest Ownership Act and largely mirrors the uniform act [and citing to] the commentary to [the UCIOA]").

(23)   NRS 116.3116 is modeled upon Section 3-116 of the 1982 version of the UCIOA, which was originally drafted by the National Conference of Commissioners on Uniform State Laws. NRS 116.3116 deviates from Section 3-116 in expanding the period of "super priority" to include unpaid assessments occurring during the preceding

9 months instead of merely 6 months, but otherwise NRS 116.3116 is identical to UCIOA Section 3-116.

(24)   Official Comment 1 to Section 3-116 describes the purpose of the section as follows:

"To ensure prompt and efficient enforcement of the association's lien for unpaid assessments, such liens should enjoy statutory priority over most other liens. ... A significant departure from existing practice, the 6 months' priority for the assessment lien strikes an equitable balance between the need to enforce collection of unpaid assessments and the obvious necessity of protecting the priority of the security interests of lenders. As a practical matter, mortgage lenders will most likely pay the 6 months' assessments demanded by the association rather than having the association foreclose on the unit. If the lender wishes, an escrow for assessments can be required. Since this provision may conflict with the provision of some state statutes which forbid some lending institutions from making loans not secured by first priority liens [state law should be consulted]."

(25)   Thus, the drafters of the UCIOA expressly contemplated that, as a practical matter in most cases, the holder of the first security interest would seek to protect its interest from subordination to a "super priority" lien by simply paying the unpaid assessments. However, the Comment does not expressly specify whether, if a lender chooses not to do so and instead permits the property to proceed to foreclosure, the lender's first security interest is thereby extinguished. Furthermore, nothing else in either the plain text or comments of UCIOA appear to relate specifically to the question of whether a foreclosure sale initiated due to unpaid assessments extinguishes all other junior liens, including a first security interest rendered junior because of the "super priority" provision. Quite to the contrary, Comment 1 suggests that the drafters of the UCIOA intended to leave this question to state law rather than establishing uniform national standards.

(26)   In Opposition to the Motion, the Plaintiff notes that, as a general principle of Nevada law, foreclosure of a superior security interest extinguishes all junior interests that did not participate in the foreclosure process. *E.g.*, *Brunzell v.*

1   *Lawyers Title Ins. Co.*, 101 Nev. 395 (1985); *Erickson Construction Co. v. Nevada*
2   *National Bank*, 89 Nev. 350 (1973). The Plaintiff also notes that the Nevada
3   Department of Business and Industry has issued an administrative opinion, dated
4   December 12, 2012, that interprets NRS Chapter 116.3116 such that a foreclosure
5   based upon a "super priority" lien extinguished a first security interest made junior only
6   due to the "super priority" statute. The Plaintiff also cites to an opinion by a
7   Washington State appellate court (interpreting a statute identical to the UCIOA) finding
8   that a foreclosure based upon a "super priority" lien extinguished a first security interest
9   that was given notice of the pending foreclosure and yet chose not to participate.
10  *Summerhill Village HOA v. Roughly*, 270 P.2d 639 (Wash.Ct.App. 2012). The Plaintiff
11  also notes that some Judges of this Judicial District have resolved this question in favor
12  of the Plaintiff's argument. The Court also notes that at least one scholarly
13  commentator has opined that a non-judicial foreclosure sale under the UCIOA
14  extinguishes all junior liens that did not participate in the foreclosure process as
15  "necessary parties." *See*, Winokur. "Meaner Lienor Community Associations: The
16  'Super Priority' Lien and Related Reforms Under The UCIOA," 27 Wake Forest Law
17  Review 353, 378 n.106 (1992) ("foreclosure extinguish[es] the Less-Prioritized Lien").
18          (27)    In support of its Motion, the Defendant cites to an opinion issued by
19  Judge Dawson of the U.S. District Court, *Diakonos Holdings LLC v. Countrywide*
20  *Home Loans*, 2013 WL 531092 (D.Nev. February 11, 2013), rejecting the reasoning of
21  the Washington court in *Summerhill*. The Defendant also cites to various unpublished,
22  non-precedential Orders issued by other Judges of this Judicial District that have found
23  that a foreclosure sale based upon a "super priority" lien does not extinguish a first
24  security interest upon the property. (*See*, Defendant's Motion, pages 11-14).
25          (28)    In short, the situation before this Court appears to be as follows. By this
26  Motion, this Court is asked to interpret the scope and meaning of a statute that was
27  enacted by the Nevada Legislature after virtually no meaningful debate, that was
28  modeled on a broad uniform act that specifically left unanswered the question raised by

1  this Motion, whose legislative sponsor urged the Legislature not to deviate from the

2  text of the uniform act so that the courts of this State could rely upon precedent from

3  other states, and upon which the courts of different states, and the Judges of this

4  Judicial District, have taken different positions.

5      (29)   In the absence of clear guidance from the text of the statute or its

6  legislative history, this Court is left to examine other sources for guidance. One such

7  source consists of other statutes that relate to matters similar to those addressed by NRS

8  116.3116.

9      (30)   In Nevada, holders of security interests against real property may initiate

10  foreclosure through multiple statutory avenues. For example, the holder of a mortgage

11  may initiate a judicial foreclosure via NRS 40.430 et seq. The holder of a deed of trust

12  may also initiate a non-judicial foreclosure (commonly known as a "Trustee's Sale")

13  pursuant to NRS 107.080 et seq. A landlord (or other assignee of the right to receive

14  rent from real property) may also seek the appointment of a receiver to initiate a

15  foreclosure upon a security instrument pursuant to NRS 107A.260.

16      (31)   It is well-settled that any foreclosure sale conducted pursuant to NRS

17  40.462, 107.080, or 107A.260 automatically extinguishes all junior security interests

18  against the property. *E.g., Brunzell v. Lawyers Title Ins. Co.*, 101 Nev. 395 (1985);

19  *Erickson Construction Co. v. Nevada National Bank*, 89 Nev. 350 (1973). Thus, the

20  Defendant is essentially arguing that a foreclosure conducted pursuant to NRS

21  116.3116 is something wholly unique under Nevada law, because it would represent

22  the only type of foreclosure permitted in Nevada under which junior liens would not be

23  automatically extinguished.

24      (32)   However, if the Defendant is correct that foreclosures conducted pursuant

25  to NRS 116.3116 are unique under Nevada law, then there must exist something in the

26  text or legislative history of NRS 116.3116 that says so. Under settled rules of

27  statutory interpretation, the Court cannot read NRS 116.3116 as a unique,

28  unprecedented, and *sui generis* departure from long-established norms relating to

foreclosure sales in Nevada unless there is some indication in the text or legislative
history that the Legislature intended this to be the case. There is not. Quite to the
contrary, the complete absence of anything within NRS Chapter 116 regarding the
question of extinguishment suggests that the Legislature intended that Chapter 116
foreclosures would be handled as any other type of foreclosure.

(33)    Notably, NRS 40.462 was enacted in 1989, and NRS 107.080 was
originally enacted in 1927. In other words, both NRS 40.462 and 107.080 pre-date the
enactment of NRS 116.3116, as does the opinion of the Nevada Supreme Court in
*Erickson Construction Co. v. Nevada National Bank*, 89 Nev. 350 (1973) (holding that
non-judicial foreclosure sales automatically extinguish junior liens). Thus, the
Legislature must be presumed to have known when NRS 116.3116 was enacted that the
normal consequence of a foreclosure sale in Nevada would be that all junior liens are
automatically extinguished. Had the Legislature intended that NRS 116.3116 represent
a singular departure from established legal norms, the Legislature certainly could have
included language to that effect. The Court notes that the Legislature utilizes a variety
of common phrases throughout the NRS when it intends to create exceptions to other
statutes; *see, for example*, NRS 78.090(1) ("Notwithstanding the provisions of NRS
77.300..."); NRS 62B.390(1) ("Except as otherwise provided in NRS 62B.400...");
NRS 62E.010(2) ("Except as otherwise provided by specific statute...."); NRS
78.120(1) ("Subject only to such limitations as may be provided by this chapter...");
NRS 48.025 ("All relevant evidence is admissible, except as otherwise provided by this
title..."); NRS 51.075(2) ("The provisions of NRS 51.085 to 51.305, inclusive, are...not
restrictive of the exception provided by this section"). Yet none of these phrases are
contained anywhere within NRS Chapter 116 in any context that suggests an intention
to depart from the ordinary rule that, in Nevada, foreclosure sales extinguish junior
liens. The absence of any language to this effect suggests that this was not the
intention of the Legislature.

(34)    Moreover, NRS 116.3116 et seq. contains a series of specific departures and deviations from the foreclosure proceedings established in NRS 40.462 and 107.080, but none that relate to the extinguishment or non-extinguishment of junior liens. For example, the idea of "super priority" exists nowhere in NRS Chapter 40 or 107. Similarly, neither NRS 40.462 nor 107.080 include the kinds of specific notice provisions required by NRS Chapter 116 before a foreclosure sale can be initiated. Yet the Legislature included no language in NRS 116.3116 that can be read as departing from the principle of extinguishment. It is well-settled that the inclusion of one thing must be read as the implying the omission of another (*"expressio unius est exclusio alterius"*). Thus, when the Legislature chose to include language designed to deviate in certain specific ways from established foreclosure practices, but not language that changes whether junior liens are extinguished, that choice must be deemed by this Court to have been intentional and deliberate.

(35)    Furthermore, not only did the Legislature include no language departing from the principle of extinguishment under NRS Chapter 40 and 107, it included language in NRS Chapter 116 highly similar to language contained in NRS Chapter 107 that expressly recites that junior liens are extinguished. NRS 107.080(5) recites that a Trustee's Sale "vests in the purchaser the title of the grantor...without equity or right of redemption." NRS 116.31166(3) recites that a foreclosure sale initiated pursuant to NRS 116.3116 "vests in the purchaser the title of the unit's owner without equity or right of redemption." This similarity suggests that the Legislature intended that a purchaser at a NRS Chapter 116 foreclosure sale acquires exactly the same title as he would have acquired had the foreclosure been a NRS Chapter 107 Trustee's Sale, i.e., title free and clear of junior encumbrances. Moreover, the words "without equity or right of redemption" were defined long ago by the Nevada Supreme Court, which held that a sale "without equity or right of redemption" is one that vests the purchaser with "absolute legal title as complete, perfect and indefeasible as can exist...and a sale, upon due notice to the mortgagor, whether at public or private sale, forecloses all

equity of redemption as completely as a decree of court." *Bryant v. Carson River Lumbering Co.*, 3 Nev. 313, 317-18 (1867), quoted in *In re Grant*, 303 B.R. 205, 209 (Bankr.D.Nev. 2003).

(36)    Thus, the operation of NRS 116.3116 appears to be as follows. NRS 116.316 creates a series of specific and unique requirements when an HOA imposes a lien against a property and wishes to initiate a foreclosure sale to satisfy unpaid assessments. Where NRC Chapter 116 is silent, the Court must presume that the Legislature intended that the ordinary and established principles governing the conduct of foreclosure sales in Nevada apply to "fill in the gaps."

(37)    Accordingly, when a homeowners' association imposes a lien for unpaid assessments, a portion of the unpaid assessments (not exceeding nine months) are entitled to "super priority" status over existing liens and mortgages. NRS 116.3116(2). However, in order to perfect this "super priority" lien, the association must give proper notice to all parties including any holders of first security interests whose priority will have been adversely affected. NRS 116.31163(2). Furthermore, if the association wishes to foreclose upon the property in order to satisfy its lien, it may do so, but only after given specific notice to all subordinate lienholders of record. NRS 116.311635(1)(a)(2). As expressly contemplated by Comment 1 to UCIOA Section 3-116, most subordinate lienholders would likely protect their interest from extinguishment by simply paying off the unpaid assessments. Indeed, that appears to be the specific purpose of requiring that those lienholders be given notice under NRS 116.31163(2) and NRS 116.311635(1)(a)(2). But if those subordinate lienholders fail to stave off foreclosure by paying off the assessment, then their subordinate claims are paid off with any surplus proceeds of the foreclosure sale. NRS 116.31164(3)(c)(4). After the sale is completed, any subordinate claims are automatically extinguished by operation of law. *Erickson Construction Co. v. Nevada National Bank*, 89 Nev. 350 (1973) (holding that non-judicial foreclosure sales automatically extinguish junior liens). If the lender's mortgage remains unsatisfied after the foreclosure sale, it may be

1   able to pursue a deficiency action against the mortgagor of record (the original

2   defaulting party), but not any claim against the property itself or against new bona fide

3   third-party who purchased the property at the foreclosure sale.

4       (38)   In their briefs, both parties advance various policy and "fairness"

5   arguments in support of their respective positions. For example, the Defendant argues

6   that permitting a bona-fide third-party purchaser to procure a property for a mere

7   $2,000 while extinguishing a mortgage worth many times that amount is "unfair".

8   However, any junior lienholder has a simple remedy for this unfairness -- as expressly

9   contemplated by Comment 1 to UCIOA Section 3-116, a lender can avoid foreclosure

10  and protect its interest from extinguishment by simply intervening to pay off the

11  assessments.

12      (39)   Moreover, the Court notes that the Defendant's argument would lead to

13  an equally "unfair" result. In this case, if the Defendant's argument were adopted, then

14  the net result would be that the Plaintiff will have paid $2,000 to satisfy the

15  association's lien, yet does not own the Subject Property. In effect, the Plaintiff paid

16  off the lien asserted by the HOA and acquired nothing in return, because immediately

17  after it acquired the Subject Property, the property was taken by the Defendant and sold

18  to someone else for more money. This result appears fundamentally unfair to bona fide

19  third-party purchasers who will have paid off the assessments that the lender failed to

20  pay despite having been given specific notice of the existence of the unpaid

21  assessments, and despite the obvious intent of the drafters of the UCIOA that, in most

22  cases, the lender would protect its own interest by paying off the assessments. This

23  result would achieve the perverse outcome of actually rewarding sloth and inaction on

24  the part of the lender, who, as expressly recognized by Comment 1 to UCIOA Section

25  3-116, is the one party (other than the defaulting owner) in a position to stop the

26  foreclosure, protect its own interests, and make the association whole by paying the

27  assessments. Instead, the Defendant's interpretation of NRS 116.3116 would result in

28  the association and the lender being made whole at the expense of bona fide third-party

JEROME TAO
DISTRICT JUDGE
DEPARTMENT XX

1 purchasers, a result that is quite obviously absurd.

2     (40)   The Defendant appears to suggest this outcome, however unfair, is the
3 natural consequence of the fact that the Plaintiff attempted to purchase the Subject
4 Property for less than the cumulative total of all existing encumbrances upon the
5 Subject Property, and "buyer beware" because, had the Plaintiff properly done its
6 homework, it should have known that it might stand to lose the Subject Property unless
7 it purchased the Subject Property for an amount sufficient to pay off all existing liens.

8     (41)   But, as noted, the party best-positioned to protect its interests (and
9 incidentally to protect any innocent third parties) is the lender whose interests are
10 directly at stake. It is a well-recognized principle of Nevada law that when both
11 potential interpretations of a statute or rule are unfair to someone, the brunt of any
12 unfairness should not fall on innocent third parties. *E.g., NC-DSH Inc. v. Garner*, 125
13 Nev. 647, 656 (2009) (in choosing who should suffer from the fraudulent actions of an
14 agent, "ordinarily, the sins of an agent are visited upon his principal, not the innocent
15 third party with whom the dishonest agent dealt"); *Rothman v. Fillette*, 469 A.2d 543,
16 545 (Pa. 1983) (cited approvingly in *NC-DSH Inc. v. Garner*, 125 Nev. 647, 656
17 (2009)) ("a principal acting through an agent in dealing with an innocent third party
18 must bear the consequences of the agent's fraud" because of "the long recognized
19 principle that where one of two innocent persons must suffer because of the fraud of a
20 third...the loss should be borne by him who put the wrongdoer in a position of trust and
21 confidence and thus enabled him to perpetrate the wrong"). *See also, Tri-County
22 Equipment & Leasing v. Klinke*, 128 Nev. Adv. Op. 33 (June 28, 2012) (Gibbons, J.,
23 concurring) (when one party is likely to receive a windfall, it should be the party who
24 lacks any responsibility for the situation) (relevant citations omitted). In this case, it is
25 true that the lender cannot be said to bear responsibility for the non-payment of
26 assessments by the record owner. However, the lender is in a far better position to
27 protect its interests, make the association whole, and eliminate the need for foreclosure
28 than a third-party purchaser at the foreclosure sale with no connection to the lender, the

1  HOA, or the previous owner.  Yet, accepting the Defendant's argument in this case
2  would result in the Plaintiff being the only party who suffers any monetary loss from
3  the non-payment of assessments, as both the HOA and the Defendant have been made
4  whole.  That result is fundamentally unfair and could not have been what the
5  Legislature intended.

6       (42)   In a sense, this outcome can be seen as unfair to the lender whose interest
7  in this case was extinguished by the purchase of the Subject Property for a mere
8  $2,000.  However, Comment 1 to UCIOA Section 3-116 proposes two simple
9  solutions.  First, the lender (having been given specific notice of the association's
10 "super priority" lien) can protect its interest by paying the unpaid assessments before
11 foreclosure is initiated by the association, thereby removing the "super priority" lien
12 and ensuring that its security interest is the most senior one remaining.  Alternatively,
13 and more proactively, as noted by Comment 1 the lender can ensure that there can
14 never be a default or a "super priority" lien by simply impounding money in advance
15 and paying the assessments itself, much as lenders now commonly impound money to
16 pay tax bills in order to prevent tax liens and government tax foreclosures.  In either
17 case, the association will have been made whole, thus accomplishing the fundamental
18 purpose of NRS 116.3116, and the lender can seek to satisfy its own security by
19 initiating its own foreclosure at which its security interest would be the most senior
20 encumbrance.

21      (43)   In general, however, questions regarding the fairness of any public policy
22 are for the Legislature to resolve, not for the Judiciary.  The Legislature is entitled to
23 enact legislation that may, in some instances, be unfair to some parties.  But the
24 Judiciary cannot substitute its own judgment for that of the Legislature and read a
25 statute in a manner other than as it is drafted merely because the application of the
26 statute might seem unwise.  In this case, the disposition of this Motion is based upon
27 the application of clear principles of statutory interpretation.  In the complete absence
28 of any language in NRS Chapter 116 reflecting a Legislative intent to depart from the

established principle that subordinate liens are extinguished by foreclosure sales, the Court must assume that the Legislature intended that Chapter 116 foreclosures operate precisely in the same manner.

(44)   For the foregoing reasons, the Defendant's Motion to Dismiss is DENIED.

DATED: May 30, 2013

_____
JEROME T. TAO
DISTRICT COURT JUDGE

## CERTIFICATE OF SERVICE

I hereby certify that I served a copy of the foregoing, by mailing, by placing

copies in the attorney folder's in the Clerk's Office or faxing as follows:

Luis A. Ayon, Esq., and Margaret E. Schmidt, Esq. - Via Facsimile: 792-9002
Karl L. Nielson, Esq. - Via Facsimile: 692-8099
Gregory L. Wilde, Esq. - Via Facsimile: 258-8787
Chelsea A. Crowton, Esq. - Via Facsimile: 946-1345

Paula Walsh, Executive Assistant

# Exhibit 3



✓ FILED          RECEIVED
___ ENTERED      SERVED ON
          COUNSEL/PARTIES OF RECORD

JUN 06 2013

CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY: _____
                         DEPUTY

1

2

3

4          UNITED STATES DISTRICT COURT

5              DISTRICT OF NEVADA

6

BAYVIEW LOAN SERVICING, LLC,                 )

7                                            )
          Plaintiff,                         )

8                                            )          2:13-cv-00164-RCJ-NJK
          vs.                                )

9                                            )
ALESSI & KOENIG, LLC et al.,                 )          **ORDER**

10                                           )
          Defendants.                        )

11 _____  )

12          This quiet title action arises out of the foreclosure of a lien for delinquent homeowner's

13 association ("HOA") fees.  Pending before the Court are cross motions for summary judgment.

14 For the reasons given herein, the Court grants Plaintiff's motion and denies Defendant's.

15 **I.      FACTS AND PROCEDURAL HISTORY**

16          Third-party Defendant Jesus Simiano ("Borrower") gave Third-party Defendant Silver

17 State Financial Services ("Lender") a promissory note for $176,000, secured by a deed of trust

18 ("DOT"), to refinance real property located at 5124 Lost Canyon Dr., North Las Vegas, NV

19 89031 (the "Property"). (Compl. ¶ 9, Jan. 30, 2013, ECF No. 1; DOT 1–3, July 27, 2004, ECF

20 No. 1, at 9).  Mortgage Electronic Registration Systems, Inc. ("MERS") was the beneficiary of

21 the DOT and Lender's nominee for the purpose of transferring the beneficial interest in the

22 promissory note. (*See* DOT 1–3).  MERS later assigned both its own interest in the DOT and

23 Lender's interest in the promissory note to Plaintiff Bayview Loan Servicing, LLC ("Bayview").

24 (Compl. ¶ 10; *see* Assignment, Apr. 14, 2010, ECF No. 1, at 27).

25          Defendant Alessi & Koenig, LLC ("A&K") later caused to be recorded a Notice of

1   Delinquent Assessment (Lien) ("NODA") against the Property on behalf of Defendant

2   Hometown Ovation Owners Association ("HOOA") based upon $3391.58 in delinquent fees,

3   assessments, interest, late fees, service charges, and collection costs. (Compl. ¶ 13; *see* NODA,

4   Feb. 6, 2012, ECF No. 1, at 29). A&K then caused to be recorded a Notice of Default and

5   Election to Sell Under Homeowners Association Lien ("NOD") against the Property on behalf of

6   HOOA, alleging a total of $3541.58 in delinquencies. (Compl. ¶ 14; *see* NOD, Mar. 12, 2012,

7   ECF No. 1, at 31). A&K then caused to be recorded a Notice of Trustee's Sale ("NOS") as to the

8   Property on behalf of HOOA, indicating a sale for December 5, 2012 based upon a total

9   delinquency of $4386.06. (Compl. ¶ 15; *see* NOS, Oct. 22, 2012, ECF No. 1, at 33).

10        Bayview contacted A&K concerning the NOS, and A&K postponed the sale until January

11   16, 2013. (Compl. ¶ 16). Bayview alleges it tendered the full amount due to A&K several times

12   before that date, but that A&K refused to accept payment. (*See id.* ¶¶ 17–18). A&K sold the

13   Property at the instruction of HOOA at the January 16, 2013 foreclosure sale to Defendant SFR

14   Investments Pool 1, LLC ("SFR Pool 1") or Defendant SFR Investments, LLC ("SFR")

15   (collectively, "SFR Defendants") for approximately $10,000. (*Id.* ¶¶ 19, 22). SFR later contacted

16   Bayview and communicated its position that the sale had extinguished Bayview's DOT. (*Id.*

17   ¶ 23).

18        Bayview sued A&K, HOOA, and SFR Defendants in this Court on two causes of action:

19   (1) Wrongful Foreclosure; and (2) Declaratory Relief.[1] A&K and HOOA jointly moved for

20   defensive summary judgment against the wrongful foreclosure claim, and while that motion was

21   pending, SFR Pool 1 filed its Answer, which included counterclaims and third-party claims for

22   quiet title against Bayview, Borrower, and Lender. The Court granted the motion for summary

23

24        [1]The declaratory relief claim is essentially a quiet title claim. *See Kress v. Corey*, 189
25   P.2d 352, 364 (Nev. 1948). Plaintiff asks the Court to declare in the alternative that under state
     law the trustee's sale was void or that it did not extinguish the first mortgage. (*See id.* ¶¶ 34–36).

1  judgment as against the wrongful foreclosure claim.  The parties have now moved for summary

2  judgment on their remaining quiet title claims.

3  **II.    LEGAL STANDARDS**

4          A court must grant summary judgment when "the movant shows that there is no genuine

5  dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

6  Civ. P. 56(a).  Material facts are those which may affect the outcome of the case. *See Anderson v.*

7  *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there

8  is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.*  A

9  principal purpose of summary judgment is "to isolate and dispose of factually unsupported

10  claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  In determining summary

11  judgment, a court uses a burden-shifting scheme:

12          When the party moving for summary judgment would bear the burden of proof at
            trial, it must come forward with evidence which would entitle it to a directed verdict
13          if the evidence went uncontroverted at trial.  In such a case, the moving party has the
            initial burden of establishing the absence of a genuine issue of fact on each issue
14          material to its case.

15  *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations

16  and internal quotation marks omitted).  In contrast, when the nonmoving party bears the burden

17  of proving the claim or defense, the moving party can meet its burden in two ways: (1) by

18  presenting evidence to negate an essential element of the nonmoving party's case; or (2) by

19  demonstrating that the nonmoving party failed to make a showing sufficient to establish an

20  element essential to that party's case on which that party will bear the burden of proof at trial. *See*

21  *Celotex Corp.*, 477 U.S. at 323–24.  If the moving party fails to meet its initial burden, summary

22  judgment must be denied and the court need not consider the nonmoving party's evidence. *See*

23  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

24          If the moving party meets its initial burden, the burden then shifts to the opposing party to

25  establish a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

1    475 U.S. 574, 586 (1986).  To establish the existence of a factual dispute, the opposing party

2    need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

3    claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

4    versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d

5    626, 631 (9th Cir. 1987).  In other words, the nonmoving party cannot avoid summary judgment

6    by relying solely on conclusory allegations unsupported by facts. *See Taylor v. List*, 880 F.2d

7    1040, 1045 (9th Cir. 1989).  Instead, the opposition must go beyond the assertions and

8    allegations of the pleadings and set forth specific facts by producing competent evidence that

9    shows a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 324.

10        At the summary judgment stage, a court's function is not to weigh the evidence and

11    determine the truth, but to determine whether there is a genuine issue for trial. *See Anderson*, 477

12    U.S. at 249.  The evidence of the nonmovant is "to be believed, and all justifiable inferences are

13    to be drawn in his favor." *Id.* at 255.  But if the evidence of the nonmoving party is merely

14    colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

15    **III.    ANALYSIS**

16        In Nevada, HOAs have immediate liens against real property when HOA assessments or

17    other costs against a unit become delinquent. *See* Nev. Rev. Stat. § 116.3116(1).  Under Nevada

18    law, a lien for delinquent HOA assessments is not prior to "[a] first security interest on the unit

19    recorded before the date on which the assessment sought to be enforced became delinquent," *id.*

20    § 116.3116(2)(b), except:

21        *to the extent of* any charges incurred by the association on a unit pursuant to NRS
         116.310312 and *to the extent of* the assessments for common expenses based on the
22        periodic budget adopted by the association pursuant to NRS 116.3115 which would
         have become due in the absence of acceleration during the 9 months immediately
23        preceding institution of an action to enforce the lien . . . .

24

25

1   *Id.* § 116.3116(2) (unnumbered paragraph following subsection (2)(c) (emphases added)).[2] In

2   other words, a first mortgage recorded before HOA assessments become delinquent is senior to

3   an HOA lien, except to the extent of nine months of regular HOA dues immediately preceding

4   the action to enforce the HOA lien and any HOA fees and costs related to exterior maintenance

5   of the unit at issue or the removal or abatement of a public nuisance related to the unit at issue.[3]

6   It seems clear that the super-priority amount is unextinguished by foreclosure of a first mortgage,

7   even if the first mortgage is otherwise senior under the first mortgage rule.   The question is

8   whether the foreclosure of an HOA lien including some super-priority amount extinguishes a first

9   mortgage that has benefit of the first mortgage rule.   The Court believes that the best

10  interpretation of the statutes is that it does not.

11          Bayview's interpretation of the statute, with which the Court agrees, is that the first

12  mortgage rule prevents a prior-recorded first mortgage from being extinguished by foreclosure of

13  an HOA lien that contains a super-priority amount.  Under this interpretation, an HOA lien

14  arising *before* a first mortgage is recorded is senior to the first mortgage in all traditional

15  respects, i.e., it survives a foreclosure of the first mortgage, and its own foreclosure extinguishes

16  the first mortgage.  But an HOA lien arising *after* a first mortgage is recorded operates

17  unorthodoxly in relation to traditional liens.  The super-priority amount is senior to an earlier-

18  recorded first mortgage in the sense that it must be satisfied before a first mortgage upon its own

19  foreclosure, but it is *in parity with* an earlier-recorded first mortgage with respect to

20  _____

21          [2]Section 116.310312 concerns HOA fines and costs imposed when an HOA must
     maintain the exterior of a unit in accordance with the CC&R or remove or abate a public
22  nuisance on the exterior of the unit where the unit owner has failed to do so. *See id.*
     § 116.310312(2). Section 116.3115 governs regular HOA dues. *See id.* § 116.3115.

23          [3]The Court will refer to this amount as the "super-priority amount" and will refer to the
     section of the statute defining it as the "super-priority rule." The Court will refer to any excess
24  portion of an HOA lien, i.e., the total amount of a lien under subsection (1) minus the super-
     priority amount, as the "sub-priority amount." The Court will refer to subsection (2)(b) as the
25  "first mortgage rule."

1    extinguishment, i.e., the foreclosure of neither extinguishes the other.

2         In practice, two options present themselves under this theory when a first mortgage is

3    recorded before an HOA lien arises.  First, an HOA may of course foreclose its lien under the

4    statutes so providing, but the first mortgagee's lien survives such a foreclosure, and the first

5    mortgagee may later foreclose against the buyer at the HOA foreclosure sale if that buyer (or

6    someone else) does not satisfy the first mortgage out of the proceeds of the HOA foreclosure sale

7    or otherwise.  An HOA conducting a foreclosure sale will be made whole under the statute so

8    long as the super-priority amount is satisfied by the foreclosure sale price, and if an HOA's

9    foreclosure sale leaves some portion of its "super-priority" lien unsatisfied—which

10   circumstances are unlikely ever to occur—it must pursue the unit owner for the deficiency.

11   Second, a first mortgagee may foreclose while an HOA lien exists.  In such a case, the super-

12   priority amount of the HOA lien survives foreclosure, and the HOA may later foreclose against

13   the buyer at the foreclosure sale if that buyer (or someone else) does not satisfy the super-priority

14   amount out of the proceeds of the foreclosure sale or otherwise.  In either case, any sub-priority

15   amount of an HOA lien is extinguished along with any other junior liens.  Those junior liens are

16   satisfied in sequence of priority out of the foreclosure proceeds after the lien upon which the

17   foreclosure was based is fully satisfied, and junior lien holders must pursue the defaulted party

18   for any deficiencies, if they can.

19        In summary, an HOA may effectively have two liens: a super-priority lien, and a sub-

20   priority lien.  The foreclosure of neither a super-priority lien nor a first mortgage extinguishes the

21   other.  They are in parity with one another in this regard.  But a super-priority lien must be

22   satisfied first out of the proceeds of the foreclosure of a junior lien.  It is "first amongst equals" in

23   this regard.  The sub-priority lien, on the other hand, like any other junior lien, is extinguished by

24   the foreclosure of either the super-priority lien or the first mortgage.

25        Another court of this District recently ruled consistently with this interpretation, though

1   with less discussion. *See Diakonos Holdings, LLC v. Countrywide Home Loans*, No. 2:12-cv-

2   00949, 2013 WL 531092, at *2–3 (D. Nev. Feb. 11, 2013) (Dawson, J.) (ruling that the

3   foreclosure of an HOA lien containing a super-priority amount does not extinguish a first

4   mortgage protected by the first mortgage rule).  Moreover, the real estate community in Nevada

5   clearly understands the statutes to work the way the Court finds.  In the current real estate market

6   in Nevada, most homes sold at foreclosure are purchased by investors for cash in order to

7   renovate the homes and then resell them for a quick profit or rent them.  If investors believed that

8   HOA foreclosures extinguished first mortgages, homes sold at HOA foreclosure sales would sell

9   for significant fractions of their fair market value, not for the tiny fractions of their fair market

10   value approximating the HOA lien at which HOA-foreclosed homes invariably sell.  That

11   investors will not pay significant amounts, i.e. fair amounts, for HOA-foreclosed homes indicates

12   their perception that the first mortgage survives, preventing any profit through resale.  If the

13   actors in the real estate market in Nevada believed that an HOA foreclosure extinguished the first

14   mortgage, one would expect the Property here to have sold for something on the order of $80,000

15   (assuming the home is worth roughly half of the $176,000 for which Borrower refinanced it in

16   2004).  But the Property sold for a mere $10,000, only slightly more than HOOA's lien.  This

17   shows that the Nevada real estate community does not operate as if HOA foreclosures extinguish

18   first mortgages recorded before the HOA delinquency arises.

19         SFR Pool 1's interpretation of the statute is different.  Under its theory, the foreclosure

20   of HOOA's lien completely extinguished Bayview's first mortgage in the same way that the

21   foreclosure of a first mortgage extinguishes a second mortgage (although SFR Pool 1 presumably

22   agrees that Bayview was entitled after HOOA's foreclosure sale to satisfy its first mortgage out

23   of the proceeds after any super-priority amount was satisfied and before any sub-priority amount

24   was satisfied).  SFR Pool 1 argues that the foreclosure of an HOA lien that includes any super-

25   priority amount—and they always will, as the super-priority amount is defined—extinguishes a

first mortgage. Under this theory, an HOA may foreclose its lien, and the first mortgagee's lien would not survive, though it would be entitled to satisfaction from the proceeds after the super-priority amount is satisfied and before any sub-priority amount is satisfied. And a first mortgagee could still foreclose the first mortgage while an HOA lien exists, but the super-priority amount of the HOA lien would survive.

SFR Pool 1 argues that the Division of Real Estate has interpreted the statutes this way. But a close look at the relevant document indicates no such authoritative interpretation. *See* Dep't of Business and Indus., Real Estate Div., Adv. Op. No. 13-01 (Dec. 12, 2012). The relevant advisory opinion answers three questions: (1) whether the super-priority amount includes "costs of collecting" as defined under section 116.310313 (no); (2) whether the super-priority amount may ever exceed nine months of regular dues plus removal, abatement, and maintenance costs (no); and (3) whether an HOA must institute a "civil action" as defined under Nevada Rules of Civil Procedure 2 and 3 to create the super-priority lien (no). There is *obiter dicta* on page nine of the advisory opinion supporting SFR Pool 1's view. *See id.* at 9 ("The ramifications of the super priority lien are significant in light of the fact that superior liens, when foreclosed, remove all junior liens. An association can foreclose its super priority lien and the first security interest holder will either pay the super priority lien amount or lose its security."). The opinion quotes the comments to section 3-116 of the Uniform Act, noting that first mortgagees will typically pay HOA liens rather than suffer foreclosure. But that says nothing of extinguishment. A first mortgagee may pay an HOA lien rather than suffer foreclosure because it will inevitably have to foreclose itself anyway and does not wish to experience the hassle of waiting for the first foreclosure to be completed, or because it may wish to take a deed in lieu of foreclosure or authorize a short sale, and those options would be frustrated by an intermittent foreclosure by an HOA. A first mortgagee's practical desire to avoid an HOA foreclosure does not necessarily imply that the first mortgagee thinks its security would be lost thereby. The Real

1   Estate Division engaged in no further statutory analysis. Its *obiter dicta* in an advisory opinion

2   directed to other issues is unpersuasive.

3           The Court rejects this reading of the statues. It is clear to the Court that the legislative

4   intent was to ensure that no matter which entity forecloses, an HOA will be made whole (up to a

5   limited amount), while also ensuring that first mortgagees who record their interest before notice

6   of any delinquencies giving rise to a super-priority lien do not lose their security. The Court does

7   not believe that the legislature intended the extreme result of extinguishment of a first mortgage

8   in any case where an HOA forecloses its own lien.

9           The Court agrees with Bayview that interpreting the statutes as SFR Pool 1 does reads the

10  first mortgage rule out of the statutes. The statute creating the HOA lien (subsection

11  116.3116(1)) is the rule. The first mortgage rule (subsection (2)(b)) is an exception to the rule.

12  The super-priority rule (the unnumbered paragraph following subsection (2)(c)) is an exception

13  to the exception. Because the exception to the exception here necessarily includes all instances

14  of the rule itself—there can be no subsection (1) lien that does not include some super-priority

15  amount, because that amount includes virtually every kind of assessment that could be

16  delinquent, except for collection fees and costs arising therefrom—the exception under

17  subsection (2)(b) would be totally subsumed by the exception to the exception, rendering it

18  meaningless if its operation were not limited in a way that permits the exception to have some

19  application. That is, in order to give each part of the statutes some effect, the Court must read

20  them together to mean that the super-priority rule affects the priority of reimbursement, but not

21  extinguishment. Reading the super-priority rule to affect extinguishment would read the first

22  mortgage rule out of the statutes almost entirely.

23          It is true that under SFR Pool 1's interpretation, the first mortgage rule would continue to

24  have effect in a limited class of cases when an HOA forecloses a lien containing some sub-

25  priority amount. In such cases, the first mortgage rule will still ensure that the first mortgage is

1  satisfied before the sub-priority amount of the HOA lien, giving the first mortgage rule some

2  effect. Imagine a property of fair market value V, with a first mortgage balance of M and an

3  HOA lien with super-priority amount H1 and sub-priority amount H2. If the HOA forecloses,

4  and if the foreclosure extinguishes the first mortgage, the order of reimbursement will be

5  H1–M–H2. The first mortgagee is therefore no better off under the first mortgage rule in cases

6  where $V \geq H1 + H2 + M$, because in such cases the priority of reimbursement as between H2 and

7  M is of no consequence—the first mortgagee will be made whole in either case. The first

8  mortgagee is only better off under SFR Pool 1's interpretation of the first mortgage rule in cases

9  where $V < H1 + H2 + M$, because in such cases the first mortgagee's losses are limited to H1,

10  whereas without the first mortgage rule, the first mortgagee's losses would be H1 + H2. So SFR

11  Pool 1's interpretation of the statutes does retain some effect for the first mortgage rule. But the

12  effect is only seen in cases where the fair market value of the property at the time of foreclosure

13  is less than the amount due on the first mortgage or no more than a few thousand dollars more.

14  Although that circumstance is common today, it is not the historical norm, and it was not

15  common when the statutes were first adopted in 1991, over a decade before the real estate market

16  crash made "underwater" mortgages common. *See* 1991 Nev. Stat 535, 567–68.

17      The legislature cannot possibly have intended the super-priority rule to divest the equally

18  or more conspicuous first mortgage rule of any effect except in a class of cases that was rare

19  when the statutes were adopted. Not only would such an interpretation divest the first mortgage

20  rule of any significant application, it would cause an extreme result that the Court does not

21  believe the legislature intended in light of long-standing historical practice, including the practice

22  of the actors in the real estate market even after the statutes were adopted.[4]

23

24      [4]The Court also notes that the federal Contract Clause would likely be violated by any
application of such a reading of the statutes, at least as to first mortgages recorded before the
25  statutes took effect.

1    The Court rejects SFR Pool 1's argument that an HOA lien necessarily extinguishes a

2    first mortgage because the HOA foreclosure statutes indicate, just as the general non-judicial

3    foreclosure statutes do, that foreclosure gives the purchaser title "without equity or right of

4    redemption." *Compare id.* § 116.31166(3), *with id.* § 107.080(5). These statutes have nothing to

5    do with the extinguishment of junior liens. It simply means, in both cases, that a defaulted owner

6    cannot redeem his default after the sale has occurred. These are simple and otherwise

7    uninteresting recitations of the ancient common law rule that a sale after default "forecloses"

8    (ends the possibility of) the "equity of redemption" (cure of the default). From here, SFR Pool 1

9    argues that it is indisputable that foreclosure of a senior lien extinguishes all junior liens. That is

10   of course true as a general matter, but if the statutes in this case work as Bayview argues they do,

11   and the Court believes they do, they work a twist on the general rule as between first mortgages

12   and HOA liens. *See supra*. SFR Pool 1 also argues that Bayview's position that foreclosure of an

13   HOA lien can never extinguish a first mortgage would render the last sentence of section

14   116.310312(4) meaningless. But this conclusion is both factually and legally wrong. Bayview

15   does not appear to argue, and the Court does not believe, that foreclosure of an HOA lien can

16   never extinguish a first mortgage. It seems plain that when delinquencies giving rise to an HOA

17   lien occur *before* a first mortgage is recorded, foreclosure of the resulting HOA lien extinguishes

18   the first mortgage, but SFR Pool 1 admits those circumstances are not present here.[5] Also, the

19   sentence at issue reads, "The lien may be foreclosed under NRS 116.31162 to 116.31168,

20   inclusive." *Id.* § 114.310312(4). A statute permitting foreclosure is not rendered meaningless

21   simply because another statute permits some other lien to survive such a foreclosure. The State

22   of Nevada may structure its foreclosure and priority laws however it sees fit. It may structure its

23   _____

24   [5]It appears undisputed that the DOT to Bayview's predecessor-in-interest was recorded on
     August 4, 2004, such that SFR Pool 1 is clearly not a bona fide purchaser protected from
     Bayview's interest by the recording statute, and Defendants admit that HOA dues did not become
25   delinquent until 2006.

1    laws to ensure that prior-recorded first mortgagees do not entirely lose their interest upon an

2    HOA foreclosure, while also ensuring that HOAs are protected for certain costs they have

3    incurred and up to nine months of delinquent fees.

4          In conclusion, the Court believes Bayview's interpretation of the statutes is correct.

5    Bayview's position appears to represent the dominant understanding of the actors in the real

6    estate market.  Bayview's interpretation also gives each section of the statutes significant

7    application and avoids an extreme result that was almost certainly not intended by the state

8    legislature, i.e., that the foreclosure of a small lien for even $1000 of delinquent HOA dues could

9    extinguish an earlier-recorded security interest on the order of hundreds of thousands of dollars,

10   when the purpose behind the super-priority statute was simply to ensure that HOA's are made

11   whole up to a certain amount.

12         Finally, even if HOOA's foreclosure had extinguished Bayview's first mortgage, that

13   would not end the matter here.  Bayview would still have been entitled to satisfy its first

14   mortgage out of the sale proceeds after satisfaction of the super-priority amount of HOOA's lien.

15   It therefore has standing to challenge the commercial reasonableness of the foreclosure sale, and

16   the sale for $10,000 of a Property that was worth $176,000 in 2004, and which was probably

17   worth somewhat more than half as much when sold at the foreclosure sale, raises serious doubts

18   as to commercial reasonableness. *See Levers v. Rio King Land & Inv. Co.*, 560 P.2d 917, 919–20

19   (Nev. 1977).

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

**CONCLUSION**

IT IS HEREBY ORDERED that the Motion for Summary Judgment (ECF No. 33) is GRANTED.  The mortgage of Bayview Loan Servicing, LLC against the Property at 5124 Lost Canyon Dr., North Las Vegas, NV 89031 was not extinguished by the foreclosure sale at which SFR Investments Pool 1, LLC obtained title to the Property.

IT IS FURTHER ORDERED that the Motion for Summary Judgment (ECF No. 35) is DENIED.

IT IS FURTHER ORDERED that the Clerk shall enter judgment and close the case.

IT IS SO ORDERED.

Dated this 6th day of June, 2013.

ROBERT C. JONES
United States District Judge